## EISENSTADT MFG. CO. v. J. M. FISHER CO.

(Circuit Court of Appeals, First Circuit. February 27, 1917.)

### No. 1260.

1. TRADE-MARKS AND TRADE-NAMES ⬅70(1)—UNFAIR COMPETITION—EXCLUSIVE RIGHT.

   The idea of cumulative signet tokens of adornment to become a friendship bracelet being an old one, complainant cannot, by advertising its links for a so-called friendship bracelet, obtain an exclusive right to such idea, and exclude defendant from manufacturing similar links, in the absence of a patent or protective trade-mark.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81.]

2. TRADE-MARKS AND TRADE-NAMES ⬅70(1)—UNFAIR COMPETITION—"GOOD WILL."

   Complainant extensively advertised friendship links, which could be interchanged by friends, and being strung upon narrow ribbon become a bracelet to be worn on the wrist. The links were not patented, but were designated as "bob-o-links" and being advertised as such in connection with the friendship idea were selling for many times their intrinsic value. Defendant began the manufacture of similar links, advertising itself as the manufacturer of its own product. *Held* that, as the basis of unfair competition is that defendant represented his goods as those of complainant, and to have an injunction in such cases complainant must show the existence of "good will," which is the advantage acquired by an establishment of a regular patronage, complainant, though it first advertised its particular link in connection with the friendship idea, is not entitled to an injunction; there being no showing that complainant's link had any substantial hold in the market as an article of manufacture, or that it was associated with complainant in such a sense as to constitute the good will of trade in advance of the time at which defendant put its link onto the market.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81.

   For other definitions, see Words and Phrases, First and Second Series, Good Will.]

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Bill by the Eisenstadt Manufacturing Company against the J. M. Fisher Company. From a decree dismissing the bill (232 Fed. 957), complainant appeals. Affirmed.

Edwin E. Huffman, of St. Louis, Mo., for appellant.

Stanley P. Hall, of Taunton, Mass. (Frederick S. Hall, of Taunton, Mass., Walter A. Briggs, of Attleboro, Mass., and George A. Rockwell, of Boston, Mass., on the brief), for appellee.

Before DODGE and BINGHAM, Circuit Judges, and ALDRICH, District Judge.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ALDRICH, District Judge.   In this case the alleged grievance is not for infringing a trade-mark, trade-name, or a patent.

The proceeding is one directed against the sale of a particular article of manufacture, and the relief sought is an injunction and an accounting upon the ground of unfair trade competition.   The particular article concerned is an elongated bracelet link, so formed that it can be strung upon a narrow ribbon, and the fanciful advertised idea in connection with the links has been that they are so adapted that they may be assembled and become a "friendship bracelet"; and to the end that the juvenile sentimental impulse may more surely and speedily yield to the maelstrom of show window attractions, the fascinating bob-o-link bird, so much talked about in juvenile books, is employed to do its work, and it is said in the advertisements that:

"It's a bird of an idea that has winged its way all over America."

And to the trade it is said:

"Already, without any advertising, the demand for 'bob-o-links' is running 100,000 a day, and it has only started.   When the full-page advertisement comes out in the 'Saturday Evening Post,' May 22, the whole country will break out with the 'bob-o-link' craze.   Jewelers will not be able to supply the demand fast enough to keep up with the ever-multiplying, endless chain of 'bob-o-link' wearers."

Again:

"We propose to feed the flames while they are raging by well-prepared striking advertisements in the 'Saturday Evening Post' and leading women's publications."

Again:

"On fast-moving propositions like this, the dealers who get in early get the biggest business.   When the craze gets started in your town, the dealer who has a stock of 'bob-o-links' on hand will do a big business, while the other fellow is trying to get the goods.   It is a risky business to wait, because indications all point to the probability that orders will pile up faster than we can manufacture and fill them.   Already we have increased our manufacturing facilities and are working double shift.   If this is the present condition, what will it be when this big ad. appears, and starts the 'bob-o-link' craze going in every town where friends have friends and young folks live."

And again:

"This isn't just a fad—it is a pretty plan for the expression of friendship, made practical by the beauty and value of the completed bracelet."

Then it is said:

"Here's the Way it Works.

"A girl starts a bracelet by exchanging 'bob-o-links' with a friend.   They each wear their 'bob-o-link' with the friend's initials engraved upon it, on a narrow black velvet ribbon, around the wrist.   Then they start other friends by exchanging 'bob-o-links' with them.   Thus they complete their own bracelet, and, in doing so, start ten or a dozen other girls, who, in turn, start another ten or a dozen, and so it goes until everybody has a 'bob-o-link' bracelet.   It takes from nine to twelve 'bob-o-links' to complete a bracelet, and a girl isn't satisfied until she has one completed—then she immediately starts another.   There is no end to it."

Again:

"Buy Her a Link—25 Cents Each."

To the public, attractive advertisements were put out with a picture of gracefully clasped hands with a slight show of the feminine wrist; and to more effectively move the juvenile impulse to trade, the wrist is takingly adorned by a narrow band of black velvet ribbon strung with a single link.

It must be borne in mind in this case that the substantive thing sought to be protected is distinctively a thing of manufacture, a link of distinct form and appearance.

It is quite impossible to view the particular article of manufacture when disassociated from the advertised fanciful idea of friendship as the feature which in any substantial way attracted trade. As well said by the court below, the trading public was little concerned, if at all, with the particular link as a link, or with the question as to who made it.

It was the idea of receiving and holding tokens of friendship until they could be joined into a thing of adornment and remembrance that attracted juvenile buyers in the market.

This is not a case which is governed by rules obtaining in trade-mark, trade-name, and patent cases, where the attractive and distinctive features of the trade mark or name in one situation, and the novelties of the patentable device in the other, are the features to be protected, and where the one who originated the idea of attractive marks or of patentable design, or of patentable device or combination, being first in the field, under trade-mark, trade-name and patent law, is entitled to protection.

[1] The idea of cumulative signet tokens of adornment to become a friendship bracelet, like the old idea of the monogram coin bracelet, was old, and thus, so far as we can see, the situation was such that the defendant had as good a right to advertise the sentimental idea and employ it in the trade as the plaintiff.

The idea of the friendship bracelet thus formed being old, the plaintiff, by advertising, could not gain the right of monopolizing the idea of combining links of friendship into an attractive whole, because, independent of a protective patent, or of a protective trade mark, or name, his remedy in the field of competitive trade would have reference to the particular article of manufacture.

The friendship conception, not new with the plaintiff, attractively advertised under a catching dress, was well calculated to stir the friendship fancy and impulse, and particularly that of the young, and to induce them, not because of the particular form of the link, or because the link was made by a particular manufacturer, but because of the friendship idea of joining link to link until they should become a thing of graceful adornment, to buy a link at a price 25 times in excess of its intrinsic value. But after all, in every substantial sense, the trade was attracted by the sentiment, rather than by the particular article of manufacture.

[2] While one's trade should be protected against all unreasonable and unfair competition, it after all remains that the normal condition in the commercial field is freedom of the right to trade, and as the exceptional right of monopolizing trade must be clear and substantial,

when the plaintiff's grievance has reference to a sentimental, unsubstantial, and frivolous fancy, calculated to stir and move the juvenile mind into paying largely more than a thing is worth, courts of equity will not lean very far to find grounds for disturbing normal trade equilibrium.

It has been said by a text-writer on unfair trading that, after years of struggle, the law has put all cases of unfair competition, as that term is now understood, upon a common basis of fact:

"Is the defendant representing his goods as the goods of the complainant?"

Responding to the requirements of such a question, we cannot see that the particular link, or the fact that it was made by a particular party, was the consequential element inducing trade. On the contrary, it was the old conception, skillfully advertised, that stimulated impulse and promoted trade. We therefore see nothing in the case to justify the conclusion that the defendant was representing its goods as the goods of the complainant.

To have injunction remedy upon the ground of unfair competition, independent of patent, trade-mark, and trade-name rights, a party must show established good will and trade with respect to a particular article of manufacture. In short, the existence of good will as the result of trade is the substantial element of the right.

It has been said in the books that the right of a party for individual redress, based upon interference with good will, is of modern growth, not mentioned by some of the early writers; and it has often been said that it is difficult to give a legal definition of good will as the foundation of a right existing in trade. But Mr. Justice Story has defined the term "good will" as used in trade, and it seems to have been generally accepted and followed as covering the idea. It is:

"This good will may be properly enough described to be the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." Story on Partnership, § 99.

See, also, Hopkins on Trade-Marks, Trade-Names, and Unfair Competition (3d Ed.) pp. 2, 3, 218, 228.

Such a definition of the good will of trade being well enough, it will be seen that it is based upon the fundamental idea of constant or habitual customers, thus meaning that the good will must be something of substance, and something which in point of time has had a substantial existence in the markets. It cannot be possible that equitable remedy was intended or should be afforded for the protection of trade impulse resulting from a sentimental and fanciful ephemeral puff.

It is difficult for us to perceive from what is shown in the record that the plaintiff's link had any substantial hold in the market as an article of manufacture, or that it was associated in the public mind with the Eisenstadt Manufacturing Company in such a sense as to constitute the good will of trade in advance of the time at which the de-

fendant put its advertisement out and its article into the markets. As sufficiently explained by the court below, the parties were in the field at about the same time with their article of manufacture, or at least that the time of starting the two enterprises was within a very narrow circle, a circle so narrow, we think, as to render the idea of good will inadmissible as a ground for equitable injunctive interposition based upon unfair competition in trade.

Our conclusion is that the decision of the court below was right. Decree of the District Court affirmed, with costs of this court.